UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 24-cr-187 (ECT/DJF)

UNITED STATES OF AMERICA,

   Plaintiff,

v.

ABDIRAHMAN ABDI ABDULLAHI,

   Defendant.

RESPONSE IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS (ECF NOS. 26, 27)

The United States of America, by and through its attorneys, Andrew M., Luger, United States Attorney for the District of Minnesota, and William C. Mattessich, Assistant United States Attorney, hereby submits its consolidated response to the defendant's pretrial motions. (ECF Nos. 26 and 27.) The motions should be denied.

A hearing was held on these motions on October 23, 2024, before the Hon. Dulce J. Foster. (ECF No. 32 (Minute Entry); ECF No. 37 (Hr'g Tr.) ("Tr.")). At the hearing, the government called two witnesses: Eden Prairie Police Sergeant Lonnie Soppeland and Eden Prairie Detective Gennady Abramovich. In addition, the Court accepted the following exhibits:

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION |
|---|---|
| 1 | Receipt for CashApp Payment, Bates No. 000627, dated May 28, 2024 |
| 2 | Body-Worn Camera of Sgt. Lonnie Soppeland, dated May 31, 2024 |

The defendant presented no witnesses or exhibits at the hearing.

1

## BACKGROUND

On May 31, 2024, at approximately 11:30 a.m., Eden Prairie Police responded to a fire at 85XX Cardiff Lane, Eden Prairie, MN. (Tr. at 17:8-18, 18:1-8). An infant child was saved from the fire. (*Id.* at 17:15-16.) The investigation was led by Eden Prairie Police Sgt. Lonnie Soppeland and another detective. (Tr. at 17:3-7, 30:20-21.) Detective Gennady Abramovich assisted with the investigation. (Tr. at 44:23-45:9.) Sgt. Soppeland and Detective Abramovich arrived at the scene of the fire at approximately 11:40. (*Id.* at 18:5-8; 46:2-6.)

### I. Officers Respond to the Fire and Interview Witnesses

When officers first arrived, they found multiple witnesses outside the house on Cardiff Lane. (Tr. at 18:10-14, 19:10-17.) The officers interviewed witnesses at the scene. (*Id.*) They learned that an infant, whose mother lived at the house, was rescued from the house during the fire. (*Id.* 46:20-24.) Detective Abramovich interviewed the child's mother, A.M., while he accompanied her to the hospital with the child. (Tr. at 47:22-48:5.) A.M. said that two days prior to the fire, the defendant had come to the house at Cardiff Lane, threatened her, and tried to get in the door. (Tr. at 49:18-50:3.) She also told Det. Abramovich that the defendant had sent her a threatening message on the digital payment application CashApp one or two days before the fire. (Tr. at 50:4-17. *See* Gov. Ex. 1, Receipt for CashApp Payment, Bates No. 000627, dated May 28, 2024.) A.M. showed officers the receipt for the payment in the amount of $1, with the message "when I see u I'm smoke u" in the memo line. (Gov. Ex. 1.) A.M. identified the defendant as the sender. (Tr. at 52:15-24.)

Shortly afterwards, the officers identified a red Jeep as a suspect vehicle. Pizza Karma, a restaurant located in a strip mall adjacent to Cardiff Lane, notified the Eden Prairie PD that Pizza Karma's surveillance video showed a person running behind the strip mall with a gas can and a red Jeep immediately before the fire. (Tr. at 20:23, 54:19-22.) A.M. told Detective Abramovich that when the defendant came to her house two days prior, he was driving a red vehicle. (*Id.* at 54:23-55:1.)

Officers learned that the defendant was associated with an address at 64XX City West Parkway. (Tr. 20:18-19, 57:17-19.) Sgt. Soppeland went to the 6400 block of City West Parkway, where he observed a red Jeep similar to the Jeep shown in surveillance footage. (Tr. 20:22-23.) The officer saw two men laugh with each other and shake hands before one man got into the red Jeep and one got into a Toyota Camry. (*Id.* at 20:22-21:6.) Officer Soppeland recorded the license plate of both vehicles and shared the information with his investigative team. (*Id.* at 21:7-14.)

**II.   Officers Interview the Defendant at his Workplace**

Through the interviews, examination of the Pizza Karma video, and Sg. Soppeland's observations at City West Parkway, officers identified the defendant as a possible suspect. (Tr. at 21:13-22:4.) At approximately 4:30 p.m., Sgt. Soppeland and another officer, Detective Kevin Brown, traveled to question the defendant at his workplace, Eden Vape. (Tr. 21:15-21, 22:6-14.) The officers found the defendant at the vape shop and spoke to him. (*Id.* at 22:16-19.)

3

Most of the interaction with the defendant was audio and video recorded on Sgt. Soppeland's body-worn camera. (Tr. at 23:24-24:10. *See* Gov. Ex. 2, Body-Worn Camera of Sgt. Lonnie Soppeland, dated May 31, 2024.) Sgt. Soppeland turned the camera on shortly after the officers first asked the defendant to speak. (*Id.* at 24:9-15.) Due to the mechanism of the camera, the first 45 seconds of the officers' conversation with Abdullahi are recorded on video, but not an audio. (*Id.* at 24:16-25:3.) This is because the camera operated by pressing a "record" button which immediately begins recording audio and saves the previous forty-five seconds of video before the button was pressed. (*Id.*) Besides the initial introduction and request to speak, the officers did not ask the defendant any more un-recorded questions at the vape store. (*Id.* at 29:17-22.)

When the officers entered the store, Detective Brown asked the defendant if he and Sgt. Soppeland could speak to the defendant. (*Id.* at 22:22-23:4.) Detective Brown offered the defendant a fist-bump, which the defendant reciprocated. (Ex. 2, at 00:28-32.) The defendant was "cordial and appeared calm" as he asked if they could speak outside instead of inside the shop. (*Id.* at 23:5-9, 25:4-15.) The officers then walked outside the store with the defendant and stood about five feet from him without their guns or handcuffs drawn. (*Id.* at 29:23-30:8; Ex. 2, at 1:03.)

Officers interviewed the defendant outside the vape shop for approximately seven minutes without threatening him or telling him he was not free to go. (*See* Ex. 2.) The defendant repeatedly refused to provide his contact information when Detective Brown asked him. (*Id.* at 1:30-1:55; 5:52-6:16.) During the interview, the

4

defendant told the officers he had no "relatives, sisters, partners . . . girlfriends, ex-girlfriends" in Eden Prairie. (Ex. 2, at 1:03-2:26) This conflicted with investigators' information that the defendant had been in a relationship and shared a child with A.M., who lived at Cardiff Lane. (Tr. at 48:25-50:3.) He told the officers that he was on parole for violating a restraining order in Mankato. (Ex. 2, at 3:05-3:30.) He also told officers that he lived on Atwood Street. (*Id.* at 3:50-3:56.) At the end, after refusing the second time to provide his phone number, he told the officers that the best way to reach him would be through his parole officer or his lawyer. (*Id.* at 6:20-6:35.) Detective Brown provided his card, and Sgt. Soppeland provided his badge number and name. (*Id.* at 6:28-6:30.) The defendant smiled, shook both officers' hands, and walked back into the store. (6:40-7:11.)

### III. Officers Go Back to the Tobacco Store to Arrest the Defendant

At approximately 5:00 p.m., after Sgt. Soppeland interviewed the defendant and Det. Abramovich interviewed A.M., both officers met with other investigators at Eden Prairie Police Department headquarters. (Tr. 53:19-55:7.) All of the officers shared information with each other about their respective activities throughout the day. (*Id.*) The officers decided, based on their collective information, to arrest the defendant for arson. (*Id.* at 57:1-3.)

At approximately 6:00 p.m., Detective Abramovich traveled to the vape shop to locate the defendant for arrest. (Tr. at 55:17-21.) He found a red Jeep with Illinois license plates, matching the Jeep from the Pizza Karma surveillance video and the Jeep that Sgt. Soppeland had seen outside City West Parkway earlier in the day.

5

(*Id.* at 55:21-56:1.) Officers saw the defendant standing outside the drivers' door of the Jeep. (*Id.* at 56:8-19.) The defendant then walked back through the tobacco shop out the back door, where he entered a gray Toyota Camry. (*Id.* at 59:15-20.) The Camry drove around to the front of the building and pulled into a parking stall with the defendant in the back seat. (*Id.* at 15-24.) Officers walked up to the car and arrested the defendant. (*Id.* at 60:23-61:4.)

### IV. The Federal Charges and the Defendant's Motions

The defendant was charged by complaint with one count of Arson in violation of 18 U.S.C. § 844(i). (ECF No. 2.) He was indicted on July 10, 2024. (ECF No. 13.) Following his indictment, the defendant filed a Motion to Suppress Evidence from Arrest, (ECF No. 26,) and a Motion to Suppress Statements, (ECF No. 27.) Specifically, the defendant seeks to suppress evidence from the defendant's cell phones, wallet, clothes, and a DNA swab that were taken from the defendant upon his arrest. (Tr. 79:12-80:3.) He also seeks to suppress statements from his interview outside the vape store. (Tr. 80:8-10.)[1]

For his Motion to Suppress Evidence, the defendant argues that officers did not have probable cause to arrest him on May 31, 2024. (ECF No. 45 (Def. Post-Hr'g Br.), at 6-10.) He alleges that no witness identified the defendant at the scene of the incident, that the surveillance video was not persuasive because the individual's face was obscured, and that the clothes the person was wearing in the video were

---

[1] The defendant also seeks to suppress statements he made in custody after his arrest and before his Miranda rights were read. (Tr. at 80:11-16.) The parties agree that this issue is moot because the government has pledged not to use these statements in its case-in-chief.

6

"not unique" or "tied to [the defendant] prior to his arrest." (ECF No. 45, at 8.) He further argues that there is insufficient evidence tying the defendant to the red Jeep that officers identified as significant. (*Id.*) Finally, he argues that the alleged threats reported by A.M. could not form the basis for probable cause because they were vague and unsupported by any evidence of harmful intent presented at the motions hearing. (*Id.* at 9.)

As the basis for his Motion to Suppress Statements, the defendant argues that the government failed to show that the interview outside the tobacco shop was voluntary. (*Id.* at 10-11.) He argues that the missing 45 seconds of audio represents an omission that should lead the court to make an adverse inference against the government. (*Id.* at 11.) In addition, he argues that the balance of the factors articulated in *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990), weighs against the voluntariness of the interview.

## RESPONSE

**I.     The Motion to Suppress Evidence from Arrest and Search Should Be Denied (ECF No. 26)**

Eden Prairie Police had sufficient probable cause to arrest the defendant on May 31, 2024. Officers had evidence of threats from the defendant to A.M, two separate officers' observation of the defendant near a red Jeep matching the description of the suspicious car near the fire, and the defendant's lies to officers in his voluntary interview outside the vape shop. This evidence was sufficiently reliable to create a fair probability that the defendant had committed arson.

A warrantless arrest is permissible if an objectively reasonable police officer could conclude that the totality of the circumstances at the time of the arrest support a finding of probable cause. *District of Columbia v. Westby,* 583 U.S. 48, 60-61 (2018) (courts must look at the totality of the circumstances for probable cause); *United States v. Slim,* 34 F.4th 642, 646 (8th Cir. 2022) (warrantless arrests permissible if supported by probable cause); *Walz v. Randall,* 2 F. 4th 1091, 1100 (8th Cir. 2021) (probable cause is determined from the standpoint of an objectively reasonable police officer). Probable cause exists 'when the totality of the circumstances at the time of the arrest "[is] sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Finley,* 56 F.4th 1159, 1165 (8th Cir. 2023) (quoting *Brown v. City of Saint Louis,* 40 F.4th 895, 900 (8th Cir. 2022)). There must be a "fair probability" or a "substantial chance" that the person has committed an offense. *Bell v. Neukirch,* 979 F.3d 594, 603 (8th Cir. 2020) (quoting *Illinois v. Gates,* 462 U.S. 213, 243 n. 13, 246 (1983).

The totality of the circumstances on May 31 support a finding of probable cause for the defendant's arrest for arson. First, officers had evidence tying the defendant to a red Jeep seen near the fire, into which an individual appeared to place a gas can. A red Jeep was seen outside the defendant's registered address on City West Parkway, and again next to the defendant in the parking lot of the tobacco store. It is not necessary for the government to show that officers saw the

defendant renting or driving the Jeep, his actual and constructive proximity to the car was significant.

Second, officers had the testimony of a victim at the house fire. Hearsay evidence is a permissible basis for a finding of probable cause. *United States of America v. Henry,* 763 F.2d 329, 331 (8th Cir. 1985). Not only did the victim identify threats the defendant had made to her, she was able to show a record of a threatening message from the defendant. In addition, the victim further tied the defendant to the red Jeep by telling officers that the defendant had arrived at her house two days before while driving a red vehicle. Even to the extent this evidence was hearsay to the officers who did not personally hear about it from A.M., it was still a permissible basis for the arrest.

Finally, the defendant's behavior during his interview at the vape store further tied him to the arson. He lied to officers about having no relatives in Eden Prairie, which was a suspicious statement given that a resident of the razed home had identified him as the father of her child. He also refused to provide his phone number. Taken together with the evidence of the Jeep and the victim's statements, this evidence was sufficient to support a "fair probability" that the defendant had committed a crime.

In the arrest of the defendant, the Eden Prairie Police fulfilled their duty to conduct "a reasonably thorough investigation prior to arresting a suspect." *Walz,* 2 F.4th at 1103. The officers testified that at least three detectives and a number of other officers worked together to investigate the arson. This included interviews

defendant renting or driving the Jeep, his actual and constructive proximity to the car was significant.

Second, officers had the testimony of a victim at the house fire. Hearsay evidence is a permissible basis for a finding of probable cause. *United States of America v. Henry,* 763 F.2d 329, 331 (8th Cir. 1985). Not only did the victim identify threats the defendant had made to her, she was able to show a record of a threatening message from the defendant. In addition, the victim further tied the defendant to the red Jeep by telling officers that the defendant had arrived at her house two days before while driving a red vehicle. Even to the extent this evidence was hearsay to the officers who did not personally hear about it from A.M., it was still a permissible basis for the arrest.

Finally, the defendant's behavior during his interview at the vape store further tied him to the arson. He lied to officers about having no relatives in Eden Prairie, which was a suspicious statement given that a resident of the razed home had identified him as the father of her child. He also refused to provide his phone number. Taken together with the evidence of the Jeep and the victim's statements, this evidence was sufficient to support a "fair probability" that the defendant had committed a crime.

In the arrest of the defendant, the Eden Prairie Police fulfilled their duty to conduct "a reasonably thorough investigation prior to arresting a suspect." *Walz,* 2 F.4th at 1103. The officers testified that at least three detectives and a number of other officers worked together to investigate the arson. This included interviews

with witnesses at the scene, an interview with one victim at the hospital, an interview with the defendant at his workplace, a review of surveillance video, and a visit to the defendant's home at City West Parkway. The law does not require a further investigation on the part of the officers before making an arrest.

This evidence, including the minor, corroborated details, combines to establish probable cause. The defendant's criticisms of the government's evidence are insufficient to defeat that finding. If the standard were beyond a reasonable doubt, the defendant's arguments that he was not personally seen driving the red Jeep, (ECF No. 45, at 8,) or that the victim's statements were too vague, (*Id.* at 9,) may be more compelling. However, the standard for a warrantless arrest is probable cause. That standard is met here. The motion should be denied.

## II. The Motion to Suppress Statements Should Be Denied (ECF No. 27)

The statements from the defendant's voluntary interview should not be suppressed. The interview qualifies as a consensual encounter, not a custodial interrogation. Testimony at the motions hearing established that the defendant agreed to speak to the officers at his workplace, even choosing the place and manner of the interview. Throughout the interview, the defendant was never threatened or restrained. He felt comfortable enough to fist-bump and handshake the officers. He also felt comfortable enough to refuse to provide his phone number. Because Abdullahi was not in custody and he was not unduly deceived or coerced, his interview should not be suppressed.

The defendant was not in custody while he was interviewed outside the tobacco store. "A seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* 501 U.S. 429, 434 (1991). An interview is not custodial if "given the totality of the circumstances, a reasonable person would have felt at ease to terminate the interrogation and leave or cause the agents to leave." *United States v. Laurita,* 821 F.3d 1020, 1024 (8th Cir. 2016). The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983.)) There are six non-exclusive indicia of custody for *Miranda* purposes:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or

request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and], (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1024 (quoting *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990.))

These factors do not support suppression here. Only the first factor arguably weighs in favor of the defendant's motion here because the defendant was not explicitly informed he was free to leave. In addition, the defendant makes no claim that strong-arm tactics or deceptive strategems were deployed, so the Court need not consider the fourth factor. However, the other four indicia support a finding that the interview was consensual.

Regarding the second factor, the defendant's movement was unrestrained. Notably, the defendant actually dictated the location of the interview when he asked officers if they could step outside. The officers did not direct Abdullahi to any particular area. Throughout the interview, it can be seen that the officers did not block Abdullahi from leaving, do not touch him, and do not display weapons. *See United States v. Hayden,* 759 F.3d 842, 847 (8th Cir. 2014) (finding an encounter was consensual when officers "shined a flashlight on the subjects" and "clearly identified themselves as police" but "did not block the ability of [the defendants] to cross the street, did not touch [the defendants], and did not display weapons.") A

reasonable person would have felt free to terminate the encounter with Sgt. Soppeland and Det. Brown. This factor heavily weighs in favor of voluntariness.

Third, the defendant voluntarily acquiesced to the officers' request. After fist-bumping Detective Brown, the defendant agreed to speak. He did not protest or ask to leave.

The fifth factor also weighs in favor of the interview being voluntary because the atmosphere of the interview was not police-dominated. The officers approached Abdullahi at his workplace, rather than asking him to come to the police station, and asked him if he would speak with them. They then let him dictate the location of the interview by asking them to walk outside. Throughout the interview, officers made no effort to cut the defendant off from his coworkers, take his phone or drivers license, or employ any other tactic that would create an intimidating atmosphere. In contrast, even interviews at FBI headquarters have been held not to be a "police-dominated atmosphere." *See United States v. Mottl,* 946 F.2d 1366, 1369-70 (8th Cir. 1991). A conversation on the sidewalk outside the defendant's work is much less of a police-dominated atmostpher than federal law-enforcement headquarters.

Finally, the defendant was not placed under arrest at the termination of questioning. To the contrary, the officers shook his hand and provided their information. At the end of the interaction, they respected his refusal to provide contact information.

In any event, even if the Court finds that a majority of these factors appear to suggest a custodial interview, the Court can still find that the interview was

consensual. "These factors, however, are not exclusive, and custody 'cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Laurita*, 821 F.3d at 1024. The Court should heavily weigh the lack of police dominance, the lack of physical restraint, and the fact that Abdullahi was not arrested at the end of the interview.

The lack of body-worn camera audio for the first 45 seconds of the interaction is not fatal to a finding of voluntariness. Sgt. Soppeland testified under oath and subject to cross-examination about the circumstances of the interview. The defendant cites no basis to question Sgt. Soppeland's credibility regarding that conversation. In fact, Sgt. Soppeland's testimony is corroborated by the video. The defendant can be seen fist-bumping one officer on the video before the audio comes on, which is consistent with Sgt. Soppeland's testimony about the defendant's "calm" demeanor and consistent with the demeanor displayed during the recorded interview. The Court was able to hear testimony from two officers and compare that testimony to the body-worn camera. The defendant cites no authority to justify drawing an adverse inference against the government for the lack of video evidence.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the defendant's motions at ECF Nos. 26 and 27 be denied.

Dated: December 27, 2024

                                                Respectfully Submitted,

                                                ANDREW M. LUGER
                                                United States Attorney

*/s/ William C. Mattessich*

BY: WILLIAM C. MATTESSICH
Assistant U.S. Attorney
Attorney ID No. 400513