## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                          Case No. 24-cr-187 (ECT/DJF)

               Plaintiff,

v.                                                                 **REPORT AND RECOMMENDATION**

Abdirahman Abdi Abdullahi,

               Defendant.

---

This matter is before the Court on Defendant Abdirahman Abdi Abdullahi's Motion to Suppress Evidence from Arrest and Search ("Motion to Suppress Evidence") (ECF No. 26) and Motion to Suppress Statements (ECF No. 27). The Court held a hearing on Mr. Abdullahi's motions on October 23, 2024. (*See* ECF No. 32.) During the hearing, the Court received body-worn camera video and a CashApp receipt screenshot into evidence. The Court also heard testimony from two witnesses, Eden Prairie Police Sergeant Lonnie Soppeland and Eden Prairie Detective Gennady Abramovich. (*Id.*) Based on the parties' written submissions, the hearing testimony and exhibits, and on the entire file, the Court recommends that Defendant's motions be denied.

## I.    BACKGROUND

On the morning of May 31, 2024, police were called to a house fire in Eden Prairie, Minnesota. (ECF No. 37 at 17.) Five individuals, including an infant and three other children, escaped the burning house. (*Id.* at 46, 52-53.) Paramedics transported the infant to a hospital unconscious and in serious condition. (*Id.* at 46-47.) Fortunately, the infant survived. (*Id.* at 47.)

A.      **The Initial Investigation**

After arriving at the scene, Eden Prairie Police learned that a nearby business had surveillance video showing a person with a gas can and a red Jeep behind a strip mall shortly before the fire. (*Id.* at 18-19, 54.) The police believed that person started the fire and began efforts to identify the suspect. (*Id.* at 20.)

Detective Abramovich and another detective transported the infant's mother, A.M., to the hospital and interviewed her about the circumstances of the fire. (*Id.* at 46-48.) A.M. stated that, though she was not at the house when the fire started, she believed the father of the child was responsible. (*Id.* at 48-49.) She explained that, two days earlier, she called the police because the child's father had come to the Eden Prairie house in a red vehicle, threatened to kill her, and tried to force his way inside. (*Id.* at 49-50, 54-55.) She also reported that a few days before the fire, the father sent her a $1 deposit through CashApp[1] with a message in the memo line stating, "for when I see u I'm smoke u." (ECF No. 37 at 50-52; Gov't Ex. 1.) She interpreted this as a threat. (ECF No. 37 at 50-51.) A.M. produced a screenshot of the CashApp message and identified Mr. Abdullahi as the infant's father. (*Id.* at 50-52.)

Police began investigating Mr. Abdullahi and learned that he was associated with a building at 6429 City West Parkway. Sergeant Soppelman drove to that address to conduct surveillance. (*Id.* at 20.) He noticed a red Jeep parked in the area and observed two men conversing. (*Id.* at 21.) At the end of their conversation, one of them drove off in the Jeep, and the other left in a Toyota Camry. (*Id.* at 20-21.) Sergeant Soppelman recorded the license plate numbers of both vehicles, followed the Jeep for a short time, and reported his observations to the other officers on the case. (*Id.* at 21.)

---

[1] CashApp is a peer-to-peer payment application. (*See* ECF No. 37 at 50.)

**B.    The Interview**

The police learned in their investigation that Mr. Abdullahi worked at a vape shop in Eden Prairie. (*Id.*) Sergeant Soppelman went to the vape shop with Detective Kevin Brown at around 4:53 p.m. on the day of the fire to talk to Mr. Abdullahi. (*Id.*; Gov't Ex. 2.) The officers entered the store and asked an employee if Mr. Abdullahi was present. (ECF No. 37 at 22.) The employee said Mr. Abdullahi was in the back and went to go get him. (*Id.*) Mr. Abdullahi then came to the front of the store. (*Id.*) Detective Brown exchanged fist-bumps with Mr. Abdullahi (*see* Gov't Ex. 2 at 00:32) and asked if the officers could talk to him (ECF No. 37 at 22). Sergeant Soppelman testified that Mr. Abdullahi asked if they could talk outside the shop, so they went outside. (*Id.* at 23, 38; Gov't Ex. 2 at 00:38-00:55.) While exiting the store, Sergeant Soppelman opened his shirt, which concealed his body-worn camera, and pressed the record button. (Gov't Ex. 2 at 00:40-45.) The camera retains video for the 45 seconds before the record button is pressed, but it does not record audio until the button is pressed. For this reason, only video is available for the first 45 seconds of the footage. (ECF No. 37 at 24-25.) Neither the officers' request to interview Mr. Abdullahi nor his request to speak outside the shop was captured.

Once outside, Detective Brown asked Mr. Abdullahi if he had any relatives or romantic partners in the area. (Gov't Ex. 2 at 1:00-1:15.) Mr. Abdullahi shook his head "no". (*Id.* at 1:15.) Detective Brown shared his contact information with Mr. Abdullahi and asked for Mr. Abdullahi's phone number. (*Id.* at 1:15-1:36.) Mr. Abdullahi expressed confusion as to why police were asking him questions and asked why the police needed his phone number. (*Id.* at 1:40-1:47.) Detective Brown responded that Mr. Abdullahi was not obligated to share his phone number. (*Id.* at 1:47-1:52.) Detective Brown asked Mr. Abdullahi more specifically if he had a romantic partner, "baby mama," or cousin in the area (*id.* at 1:52-2:03) and Mr. Abdullahi denied this (*id.*

3

at 2:04).  Mr. Abdullahi further denied having any kids.  (*Id.* at 2:04-2:15.)  Detective Brown inquired about Mr. Abdullahi's previous criminal history, the terms of his probation, where he resided, his activities that day, and whether anyone had a personal vendetta against him.  (*Id.* at 2:15-5:20.)  Detective Brown and Mr. Abdullahi also exchanged small talk about both being from California and the weather in Minnesota.  (*Id.* at 5:20-5:58.)

Detective Brown concluded the conversation by asking Mr. Abdullahi if he had any preferences for how the police should contact him in the future.  (*Id.* at 5:58-6:05.)  Mr. Abdullahi told the detective he would rather not give his phone number and that the police could come to the vape shop or contact Mr. Abdullahi's parole officer or lawyer if they needed to talk to him.  (*Id.* at 6:05-6:15.)    Mr. Abdullahi reached out and shook both Detective Brown and Sergeant Soppelman's hands.  (*Id.* at 6:15-6:30.)  Sergeant Soppelman shared his contact information and badge number with Mr. Abdullahi.  (*Id.* at 6:30-6:58.)  After the exchange, Mr. Abdullahi again reached out and shook the officers' hands, bade them farewell, and went back into the shop.  (*Id.* at 6:58 – 7:02.)  The officers left.  (*Id.*)  The entire interaction lasted less than seven minutes.

### C.    The Arrest and Indictment

The investigative team regrouped at the police station later that same day to review the evidence they had collected, which included: (1.) Mr. Abdullahi's recent threats against A.M., including both the CashApp transmission and the in-person threat at A.M.'s home; (2.) A.M.'s report that Mr. Abdullahi came to her home in a red vehicle; (3.) the video surveillance footage showing an individual with a gas can and a red Jeep; (4.) Sergeant Soppeland's report that he spotted a red Jeep near a residence associated with Mr. Abdullahi; and (5.) Mr. Abdullahi's interview.  (ECF No. 37 at 53-55.)  After considering the evidence, the police determined there was probable cause to arrest Mr. Abdullahi for arson.  (*Id.* at 56-57.)

The investigative team tasked Detective Abramovich with going to Mr. Abdullahi's workplace to see if he was still there. (*Id.* at 55.) Upon arrival, he saw a red Jeep parked in front of the vape shop where Mr. Abdullahi worked, which matched the descriptions of both the vehicle in the business surveillance video from around the time of the fire and the vehicle Sergeant Soppeland observed in his surveillance of the residence associated with Mr. Abdullahi. (*Id.* at 55-57.) The Jeep had Illinois "fleet plates", which are common for rental vehicles, matching the plates on the red Jeep Sergeant Soppeland observed. (*Id.*)

Detective Abramovich notified the other officers to expedite their response because the Jeep was there. (*Id.* at 56.) He then saw an individual approach the driver-side door, but he could only see the person's shoes. (*Id.* at 56, 58.) When Detective Brown arrived at the scene, he was able to identify the person as Mr. Abdullahi. (*Id.*)

Mr. Abdullahi went back into the vape shop, and the red Jeep drove away. (*Id.* at 59.) He then went out the back door of the shop and entered a Toyota Camry that drove toward the front of the shop. (*Id.* at 59-60.) Detective Brown radioed to the other officers that he believed Mr. Abdullahi and others in the Camry might be aware of the police presence and attempting to find out if they were being followed. (*Id.* at 60.) The Camry eventually parked in front of the vape shop. (*Id.*) Concerned that Mr. Abdullahi may be attempting to evade the police and flee, Detectives Brown and Abramovich immediately approached the Camry and arrested Mr. Abdullahi. (*Id.* at 60-61.) The Government charged Mr. Abdullahi on June 27, 2024, and he was later indicted on one count of arson causing injury, in violation of 18 U.S.C. § 844(i). (*See* ECF Nos. 2, 13.)

## II.    DISCUSSION

Mr. Abdullahi challenges both the evidence seized as a result of his arrest and the statements he made to Sergeant Soppelman and Detective Brown during the interview outside the vape shop.   He argues that: (1.) the police lacked probable cause to arrest him, such that any evidence obtained as a result of the arrest must be suppressed (*see* ECF No. 26); and (2.) the police improperly failed to provide a *Miranda* warning before they interviewed him (*see* ECF No. 27). Neither argument is persuasive.

### A.    Motion to Suppress Evidence

#### 1.    Legal Standard

The Fourth Amendment prohibits "unreasonable" searches and seizures.   U.S. Const. amend. IV.   "A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime."   *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013).   To establish probable cause police need not have conclusive proof.   Rather, probable cause exists when there is a "mere probability or substantial chance of criminal activity."   *Id.* at 1067 (quoting *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005)).   "To determine whether an officer had probable cause to arrest an individual, [a court] examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation omitted).   In other words, courts consider "the totality of the circumstances," *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999), from the standpoint of the police who have "substantial latitude in interpreting and drawing inferences from factual circumstances," *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation omitted).   When a defendant challenges whether police had probable

6

cause to make a warrantless arrest, the prosecution has the burden to prove that probable cause existed, *see United States v. Faulkner*, No. 5:17-cr-50144 (JLV/DW), 2018 WL 6985006, at *9 (D.S.D. Aug. 30, 2018) (citing *United States v. Skinner*, 412 F.2d 98, 103 (8th Cir. 1969)).

    2.    **Analysis**

    The police relied on several pieces of evidence to conclude they had probable cause to arrest Mr. Abdullahi for the alleged arson. First, they had evidence that Mr. Abdullahi had recently and repeatedly threatened A.M. She not only told police Mr. Abdullahi had recently come to the house, verbally threatened her, and tried to gain entry (*see* ECF No. 37 at 49-50), but that he also sent her a message specifically threatening to "smoke" her (*see id.* at 50-52). A.M. and the police reasonably interpreted this message as a threat. Mr. Abdullahi argues that a nonthreatening interpretation of this message is conceivable, but he fails to suggest any plausible alternative interpretation (*see* ECF No. 45 at 9).[2] Moreover, the Court need not rule out all alternative interpretations to find that a reasonable and incriminating one establishes a basis for probable cause. *See, e.g., United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013) (finding phone calls supported probable cause for narcotics trafficking despite lack of explicit references to drugs and innocent alternative explanations).

    Mr. Abdullahi also contends A.M.'s statements regarding the threats do not support probable cause because the Government failed to proffer enough specific evidence about the content of A.M.'s statements or the history of her relationship with Mr. Abdullahi (ECF No. 45 at 9). But the Court does not need more specific information about the content of A.M.'s statements or her relationship with Mr. Abdullahi to draw the commonsense conclusion that past threats

---

[2] Defense counsel speculated during the hearing that the message may have been a proposal that Mr. Abdullahi and A.M. smoke together. (ECF No. 37 at 66.) The Court does not deem this suggestion plausible.

against a victim of a crime tend to implicate the threatener. *See Illinois v. Gates*, 462 U.S. 213, 244 (1983) (probable cause determinations call for "practical, common-sense judgment"). And insofar as Mr. Abdullahi seeks to raise doubts about A.M.'s credibility (*see* ECF No. 51 at 2), her statements reflected her personal first-hand knowledge, *see United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (witness's strong basis for knowledge can overcome deficiencies in other indicia of reliability), and she provided police with compelling evidence to substantiate her claims when she produced the screenshot of the message Mr. Abdullahi sent (*see* Gov't Ex. 1). A.M.'s statements were thus sufficiently reliable to support probable cause.

Mr. Abdullahi further questions the Government's evidence regarding A.M.s statements because another officer led the interview and Detective Abramovich was only present for portions of it. (*See* ECF No. 37 at 48; ECF No. 45 at 9.) But whether Detective Abramovich personally asked the questions or heard the responses is irrelevant, so long as his testimony accurately captured the information on which the police collectively relied in making their probable cause determination. *See United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) (stating police may rely on their collective knowledge in determining probable cause when multiple officers are involved in an investigation and there is some communication among them). There is no basis in the record to challenge the accuracy of Detective Abramovich's testimony regarding A.M.'s statements.

In assessing probable cause, police also examined the surveillance video showing a person with a gas can and a red Jeep near the site of the arson just minutes before the fire. (*See* ECF No. 37 at 54.) That video supported an inference that the fire was no accident, and someone deliberately set it. Moreover, Mr. Abdullahi was repeatedly associated with a vehicle of the same description both before and after the fire. A.M. reported that Mr. Abdullahi was driving a red

vehicle when he came to her house to threaten her.  (*Id.*)  Police saw a red Jeep parked in the vicinity of Mr. Abdullahi's residence.  (*Id.* at 55.)  And police observed Mr. Abdullahi interacting with an individual who was driving that same red Jeep shortly before his arrest.  (*Id.* at 55-56.)  Mr. Abdullahi argues the connection between Mr. Abdullahi and the red Jeep in the surveillance video is too tenuous to support probable cause.  (*See* ECF No. 45 at 8; ECF No. 51 at 1-2.)  If the red Jeep was the sole ground for his arrest, Mr. Abdullahi might be correct.  But the Jeep sightings are just one part of the evidence the police considered in evaluating the totality of the circumstances.

The police also considered Mr. Abdullahi's statements in the interview outside the vape shop.  During the interview, Detective Brown asked Mr. Abdullahi if he knew of any relatives, current or previous romantic partners, or "baby mamas" living in the area.  (Gov't Ex. 2 at 1:00-1:15, 1:52-2:03.)  Mr. Abdullahi said he did not.  (*Id.* at 1:15, 2:04.)  Detective Brown also asked more broadly if Mr. Abdullahi had any children and Mr. Abdullahi denied having any.  (*Id.* at 2:04-2:15.)  According to A.M., Mr. Abdullahi was well-aware that she lived with his child in Eden Prairie.  (ECF No. 37 at 49-50, 52.)  Mr. Abdullahi thus appears to have been lying in an effort to conceal his relationship to the victims of the fire.[3]

Mr. Abdullahi contends his statements were not incriminating because he was forthcoming about being on probation for violating a restraining order.  He argues that since the police easily could have learned the restraining order concerned his ex-girlfriend, Mr. Abdullahi was "obviously

---

[3] Regardless of whatever evidentiary value the officers may have assigned Mr. Abdullahi's interview at that time, the Court can consider their misleading nature in its probable cause determination because the Fourth Amendment requires an *objective* analysis of the evidence known to police before his arrest (*see* ECF No. 37 at 55, 57).  *See Scott v. United States*, 436 U.S. 128, 137-38 (1978) (holding that a court must conduct "an objective assessment of an officer's actions in light of the facts and circumstances then known to him;" legal justification does not rest on officer's actual state of mind).

not trying to hide information." (*See* ECF No. 51 at 3.) But it does not follow that Mr. Abdullahi's transparency on one topic means he was honest about all topics. And though Mr. Abdullahi's revelation could have exposed the falsity of his statements, it was not necessarily an indication of his honesty; rather, it might simply demonstrate that he was an incompetent liar.

Each individual piece of evidence on which the police relied added weight to their conclusion that there was probable cause to arrest Mr. Abdullahi. These pieces of evidence must not be considered in isolation, but collectively. When the threats, the video, the multiple red vehicle sightings and Mr. Abdullahi's misleading statements are considered as a whole, they amount to a "substantial chance" that Mr. Abdullahi was responsible for the arson. *Winarske*, 715 F.3d at 1067. Based on the totality of the circumstances, there was probable cause to arrest Mr. Abdullahi. The Court therefore recommends that his Motion to Suppress evidence be denied.

### B.    Motion to Suppress Statements

#### 1.    Legal Standard

The law governing the suppression of statements is well-settled. Non-custodial, voluntary statements are generally admissible, but "[w]hen a suspect is interrogated in a custodial setting, the police must advise him of his right not to answer questions and to have an attorney present during questioning." *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). In the Eighth Circuit, courts consider the following non-exhaustive list of factors in determining whether a suspect is in a form of custody akin to formal arrest:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or

10

that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

In considering these factors, a court does not resolve the question simply because a greater number of factors supports a particular outcome; a court must consider the totality of the circumstances and weigh the factors accordingly. *See United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).

## 2.    Analysis

Having carefully reviewed the body-worn camera video of Mr. Abdullahi's interview at the vape shop, the Court firmly concludes Mr. Abdullahi was not in custody. It is undisputed that the police did not advise Mr. Abdullahi the questioning was voluntary, that he was free to leave, or that he was not under arrest (*see* ECF No. 45 at 12; ECF No. 48 at 12), but this factor is not dispositive. Mr. Abdullahi plainly understood the questioning was voluntary, since he declined to share contact information and instructed the police to contact him through his parole officer or his attorney. (Gov't Ex. 2 at 6:05-6:15.)

Nor was Mr. Abdullahi's freedom of movement restrained in any way. The officers did not touch him or block him from moving (*see generally* Gov't Ex. 2), and Mr. Abdullahi determined where the interview took place when he asked the police to step outside (*see* ECF No. 37 at 23). Mr. Abdullahi asserts that he was restrained because the police approached him "in his work place with badges and guns, and asked him to come outside with them." (ECF No. 45 at 12.) But there is no evidence in the record to support his contention that the police asked him to come

outside.[4]  The Court does not credit defense counsel's unsupported statement, particularly in light of Sergeant Soppeland's credible testimony to the contrary (ECF No. 37 at 23).  And even if the officers had suggested going outside where they could speak more privately, that fact alone would not have converted the interview into a custodial interrogation because they did nothing to otherwise restrain his movements or prevent him from leaving.  Moreover, the unsurprising fact that police officers carry badges and guns is not enough to render their questioning coercive.  In *United States v. Laurita*, 821 F.3d 1020, 1024-25 (8th Cir. 2016), FBI agents went to the defendant's workplace and had a closed-door meeting with him.  The court found that the defendant's freedom of movement was not restrained in a significant way because: (1.) he was never "physically or verbally restrained"; (2.) he "never asked to move around the room or leave during the interview"; (3.) he "had a clear pathway to the door"; and (4.) the questioning was less than twenty minutes long.  *Id.* at 1024-25.  Similar considerations apply here.  Mr. Abdullahi was not physically or verbally restrained and Mr. Abdullahi never asked to move or leave once the questioning began.  And unlike the defendant in *Laurita*, 821 F.3d at 1025, he was not constrained by a closed door.  The entire encounter was approximately seven minutes long—less than half the time at issue in *Larita*, in which the court found brevity weighed against a finding that the interview was custodial.  *Id.*

The third *Griffin* factor also disfavors Mr. Abdullahi's position because he voluntarily acquiesced to the questioning.  In declining to provide his contact information, he established that

---

[4] The Court rejects Mr. Abdullahi's invitation to adopt an "adverse inference" against the Government because the officers did not turn on their body-worn cameras before they entered the shop.  (*See* ECF No. 45 at 11-12.)  He cites no precedent for the notion that an adverse inference applies in this context, and Court finds no reasonable justification for doing so in the circumstances of this particular case.  Sergeant Soppeland turned on the recorder before the officers began questioning Mr. Abdullahi, and there is nothing in the record to suggest the officers were attempting to conceal information.

he was empowered to choose which questions to answer and which questions to decline. (*See* Gov't Ex. 2 at 1:47-1:52, 6:05-6:15.)  Detective Brown further confirmed the voluntary nature of the questioning when he told Mr. Abdullahi he was not obligated to share his phone number. (*Id.* at 1:40-1:47.)  These circumstances demonstrate that Mr. Abdullahi answered the questions voluntarily and was not coerced into doing so.

The evidence further undermines any suggestion that Mr. Abdullahi's questioning took place in a police-dominated atmosphere.  To assess whether the atmosphere of an interview is "police-dominated", courts consider the "place and length of the interrogation," and whether "the police assume[d] control of the interrogation site and dictate[d] the course of conduct followed by the suspect or other persons present at the scene." *Griffin*, 922 F.2d at 1352.  In this case, as noted above, Mr. Abdullahi dictated the location of the interview, and it was relatively brief.  It also took place out in the open and only two officers were present. *Cf. Laurita*, 821 F.3d at 1025 (suspect questioned alone in a closed room); *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (suspect intermittently questioned by agents at his home while they and seven other agents executed a search warrant at the home); *United States v. Mottl*, 946 F.2d 1367 (8th Cir. 1991) (suspect questioned at FBI headquarters in Minneapolis); *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) (suspect questioned in employee lounge after multiple agents ordered all employees to "move away from their desks and move into the main office area").  That Mr. Abdullahi was questioned at his workplace also militates against finding he was in custody since it was a familiar location where he would feel "comfortable and less threatened." *See Wallace*, 323 F.3d at 1113; *Laurita*, 821 F.3d at 1027.

Mr. Abdullahi argues that the police dominated the atmosphere by surrounding him with badges and guns. (*See* ECF No. 45 at 13.)  But Detective Brown was not openly displaying his

badge or gun, and Sergeant Soppeland was wearing plain clothes to help conceal his identity as a police officer and was not holding a gun.  (*See* ECF No. 37 at 30, 34-37.)  The Court further disagrees with Mr. Abdullahi's characterization of their conduct.  The officers did not "surround" him, and they stood no closer to him than is normal for any typical social interaction.  (*See* Gov't Ex. 2; *see also* ECF No. 37 at 30, testimony of Sergeant Soppeland that he was five or six feet from Mr. Abdullahi during the interview.)  Furthermore, throughout the encounter the behavior of all participants was friendly and relaxed.  (*See generally* Gov't Ex. 2.)  Mr. Abdullahi exchanged small talk with Detective Brown, and the encounter began with an exchange of fist-bumps and ended with handshakes.  (*Id.* at 00:32, 5:20-5:58, 6:15-7:02.)  Mr. Abdullahi's contention that the interview was police-dominated is plainly belied by the video evidence.

Finally, Mr. Abdullahi does not contend that the officers used strongarm tactics or deceptive stratagems to obtain his cooperation, and there can be no dispute that he was free to leave at the conclusion of the interview.  The *Griffin* factors heavily weigh towards a finding that the interview was non-custodial.  Based on those factors and the totality of the circumstances, the Court concludes that a *Miranda* warning was not required.  The Court therefore recommends that Mr. Abdullahi's Motion to Suppress Statements be denied.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Abdirahman Abdi Abdullahi's Motion to Suppress Evidence from Arrest and Search (ECF No. 26) and Motion to Suppress Statements (ECF No. 27) be **DENIED**.

Dated: January 21, 2025              *s/ Dulce J. Foster*
                                     Dulce J. Foster
                                     United States Magistrate Judge

<u>**NOTICE**</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).